UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CURLENE MANSWELL a/k/a/ CURLENE REID,

                Plaintiff,

- against -

UNITED STATES OF AMERICA; HARLEY LAPPIN, Director of the Federal Bureau of Prisons; JAMES CROSS, JR., Former Warden of Metropolitan Correctional Center; NEWTON KENDIG, M.D., Assistant Director of Health Services for the Federal Bureau of Prisons; and MARK GLOVER, Clinical Director for Metropolitan Correctional Center,

                Defendants.

1:09-cv-04102-RJH

**MEMORANDUM OPINION AND ORDER**

---

Richard J. Holwell, District Judge:

      At around 5:30pm on January 26, 2008, on the second floor of the C tier in the Metropolitan Correctional Center (MCC), the shower pipes suddenly trembled and shook violently.  Plaintiff (then inmate) Curlene Manswell, bathing below, was struck by falling debris, some of which lodged in her left eye.  She has sought redress from the United States, the prison warden and doctor, and several other prison officials by bringing this lawsuit pursuant to *Bivens v. Six Unknown Federal Agents* ("*Bivens*") and the Federal Tort Claims Act.[1]  The *Bivens* defendants—prison system medical and administrative officials—have moved to dismiss the *Bivens* claims on the grounds that the Complaint does not plausibly allege their personal involvement; or in the alternative that the Complaint does not plausibly allege a cognizable

---

[1] 403 U.S. 388 (1971) and 28 U.S.C. § 2674, respectively.

1

constitutional violation. [16]  For the reasons that follow defendants' motion is granted in part, and the *Bivens* claims against defendants Lappin, Dodrill, Kendig, and Cross are DISMISSED.

I.  **The Allegations in the Complaint**

Because the case is before the Court on defendants' motion to dismiss, the Court takes the well-pled factual allegations of the complaint as true and draws reasonable inferences in plaintiffs' favor.  *E.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

**A.  Factual Background**

Plaintiff was incarcerated at the MCC from May 2006 through October 2008 and frequently used the C tier shower on the second floor.  (Cl. ¶¶ 9, 18.)  While showering she often heard thumping noises coming from the pipes, which would be followed by sudden increases in water temperature and shaking of the floor and walls.  (Cl. ¶ 19.)  The shower area was also completely bare of insulation, with "no tiles, plaster, or sheetrock" in the ceiling, and "only an outlay of pipes and what appeared to be a molded foundation" visible above.  (Cl. ¶ 21.)  Both plaintiff and the other inmates frequently complained to prison staff and the Warden (defendant Cross) about the problems with the shower, but nonetheless nothing was done during plaintiff's tenure at the prison.  (Cl. ¶¶ 21, 24.)

The problems with the shower came to a head on the afternoon of January 26, 2008.  (Cl. ¶ 30.)  Plaintiff was showering by herself when she "heard a loud succession of noises which sounded like 'drilling' or 'thunder,' followed by the falling of metal from the ceiling."  (Cl. ¶ 32.)  As the pipes shook, plaintiff was subjected to a shower of a different nature: falling bits of rusty metal rained down on plaintiff, striking her face and lodging in her left eye.  (Cl. ¶ 33.)  She

2

screamed, prompting a Corrections Officer to escort her out of the shower and to the MCC's medical facility. (Cl. ¶ 34.)

The next few days were difficult for plaintiff. On January 26 she waited to be seen at the medical facility for two hours, during which time other inmates attempted to remove some of the metal from her eye. (Cl. ¶¶ 40-41.) When finally seen she was allegedly given a rushed and incomplete examination, during which her eyes were hastily washed out and announced clear of foreign substances. (Cl. ¶ 43.) She was given some pain medication and returned to her cell, however her eyes had not been adequately cleaned. (Cl. ¶¶ 44, 47.)

The day after the injury, January 27, plaintiff was still in pain. Although she complained to Corrections Officers, she was not treated until after 10:00 pm that night, at which point more metal fragments were removed from her eye. (Cl. ¶¶ 46-47.) At that time she asked to see an eye specialist, but that request was denied. (Cl. ¶ 49.) The next day, January 28, plaintiff continued to experience pain. She then: (1) complained to Corrections Officers and medical personnel, but was refused treatment; (2) wrote a written complaint to the warden; and (3) reiterated her request to see an eye specialist, but was again denied. (Cl. ¶¶ 50-52.)

On the third day after the injury, January 29, plaintiff was still in pain. However the Clinical Director of the MCC, defendant Glover, refused to see her. (Cl. ¶ 53.) Also on the 29th, plaintiff was finally taken to an eye specialist at the New York Eye and Ear Infirmary. (Cl. ¶ 54.) The eye specialist found more metal fragments, removed them, and gave plaintiff an eye patch to cover her eye while it healed. (Cl. ¶ 55.) The specialist also prescribed antibiotics to cure an infection that had developed in plaintiff's left eye since the injury. (*Id.*)

Plaintiff alleges that she suffered extreme pain and emotional distress throughout this ordeal, and that she continues now to suffer severe emotional distress and persistent physical injury. (Cl. ¶¶ 56-57.)

### B. *Bivens* allegations

In addition to Federal Tort Claims Act allegations, the Complaint includes four *Bivens* counts alleged against five federal officials. The four *Bivens* counts allege that (1) plaintiff's conditions of confinement violated the Fifth Amendment's due process clause; (2) her medical treatment violated the Fifth Amendment's due process clause; (3) her conditions of confinement were cruel and unusual punishment in violation of the Eighth Amendment; and (4) that her medical treatment violated the Eighth Amendment.

Three of the *Bivens* defendants are prison administrators. Defendant Harley Lappin was at all relevant times the Director of the Federal Bureau of Prisons. (Cl. ¶ 10.) He is alleged to have "authorized, condoned and/or ratified the unreasonable and inhumane conditions under which the Plaintiff was injured." (*Id.*) Defendant Scott Dodrill was at all relevant times the Director of the Northeast Region of the Federal Bureau of Prisons. (Cl. ¶ 11.) He is also alleged to have "authorized, condoned and/or ratified the unreasonable and inhumane conditions under which the Plaintiff was injured." (*Id.*) Finally defendant James Cross, Jr. was at all relevant times the Warden at the MCC. In addition to being "responsible for the conditions under which the Plaintiff was confined," and "for supervising the medical and maintenance staff," Cross allegedly received complaints from plaintiff and other inmates. (Cl. ¶¶ 12, 50.) Each of Lappin, Dodrill, and Cross are alleged to have "willfully and maliciously developed a policy or failed to

4

develop a policy, whereby the C tier shower at MCC can become a safety hazard and an inhumane condition of confinement." (Cl. ¶26.)

The other two *Bivens* defendants are in prison medical services. Defendant Newton Kendig, M.D. was at all relevant times the Assistant Director of Health Services for the Federal Bureau of Prisons. (Cl. ¶ 13.) He is alleged to have "authorized, condoned and/or ratified the unreasonable and inhumane medical treatment which resulted in the Plaintiff's injuries." (*Id.*) Defendant Mark Glover was at all relevant times the Clinical Director for the MCC. (Cl. ¶ 14.) He is alleged to have "subjected the Plaintiff to unreasonable and inhumane medical care under which the Plaintiff was injured," and, notably, to have "refused to see the Plaintiff" a few days after the incident. (Cl. ¶¶ 14, 52.)

## II.  Legal Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (abrogated in part by *Twombly*)). In *Twombly*, the Supreme Court held that to satisfy this standard, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *See Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*). In *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (May 18, 2009), the Court clarified three aspects of the analysis mandated by *Twombly*. First, the Court reiterated that courts may not presume illegality when the "nub" of a complaint, *id.* at 1950, alleges

conduct that is equally capable of being legal: "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 557).  Second, the Court held that only well-pled factual allegations are entitled to a presumption of truth; "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.  *Cf. id.* at 1960 (Souter, J., dissenting) (arguing that conclusory statements should not be disregarded if rendered plausible by the context in which they appear).  Third, the Court held that *Twombly*'s "plausibility standard" was not limited to antitrust cases or those requiring complex discovery.  While "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task," *Iqbal*, 129 S.Ct. at 1950, *Twombly* interpreted Rule 8 and therefore applies to "all civil actions." *Id.* at 1953 (quoting Fed. R. Civ. P. 1).  Under this understanding of Rule 8, a complaint alleging that the former Attorney General and the former Director of the Federal Bureau of Investigation engaged in purposeful discrimination did not state a claim, even though the complaint alleged that they had "willfully and maliciously agreed to subject" the plaintiff to harsh conditions of a confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Iqbal*, 129 S.Ct. at 1944.

Read together, *Twombly* and *Iqbal* suggest that the Court keep in mind two requirements when adjudicating a motion to dismiss that challenges the sufficiency of a complaint's factual allegations.  First, although the Court must still accept factual allegations as true, it should not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal*, 129 S.Ct. at 1949.  Second, accepting creditable allegations as true, the Court must also determine whether they plausibly suggest an entitlement to relief. *See Harris v. Mills*, 572 F.3d

66, 72 (2d Cir. 2009) (adopting this reading of Iqbal). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr*, 592 F.3d at 321 (quoting *Iqbal*, 129 S.Ct. at 1950).

### III. Discussion

Plaintiff concedes that vicarious or *respondeat superior* liability is unavailable in *Bivens* actions, and that accordingly for *Bivens* liability to be applied to supervisors, "some level of personal involvement must be established." (Pl. Opp. 4.) As the Supreme Court explained in *Iqbal*, "a [*Bivens*] plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948 (emphasis added). The Court examines whether the requisite personal involvement has been plead with respect to each *Bivens* defendant in turn.

#### A. Defendants Lappin, Dodrill, and Kendig

The claims against defendants Lappin (Director of the Federal BOP), Dodrill (N.E. Region Director of the Federal BOP), and Kendig (Assistant Director of Health Services for the Federal BOP) are materially indistinguishable from those alleged against the Attorney General and FBI Director in *Iqbal*: they assert high-level supervisors' liability without alleging facts other than the injury and the defendants' supervisory roles. *Iqbal* found that such claims are not plausible on their face, and that holding is controlling here.

In this case the allegation of Lappin and Dodrill's personal involvement is that they were individually involved in, or intentionally ignored, a policy of constitutionally inadequate

7

plumbing in prison showers.  (Cl. ¶ 10 ("[Lappin] authorized, condoned and/or ratified the unreasonable and inhumane conditions under which the Plaintiff was injured"); ¶ 11 ("[Dodrill] authorized, condoned and/or ratified the unreasonable and inhumane conditions under which the Plaitniff was injured");  ¶ 26 ("Lappin, Dodrill and Cross each knew of, condoned, and willfully and maliciously agreed to subject the inmates at MCC, including the Plaintiff to these conditions of confinement as a matter of policy and practice"); ¶ 65 ("Lappin, Dodrill, and Cross were aware of, approved of and willfully and maliciously created the unsafe, cruel and inhumane conditions of confinement.").)  These allegations are conclusory, and therefore *Iqbal* requires that the Complaint include sufficient factual matter so as to render them plausible.  But the only factual assertion in their support is that in one of the many prisons these individuals oversaw, one shower (C-tier, second floor) shook violently and caused rust to fall from the ceiling.  This meager factual support does not render the Complaint's allegations of personal involvement plausible with respect to Lappin and Dodrill.  Accordingly the claims against Lappin and Dodrill must be dismissed.

     The claim against Kendig suffers from a similar problem.  The allegation of Kendig's personal involvement is that as the Assistant Director of Health Services for the Federal BOP, he "authorized, condoned and/or ratified the unreasonable and inhumane medical treatment which resulted in the Plaintiff's injuries."  (Cl. ¶ 13.)  That allegation is conclusory.  As factual support the Complaint only alleges that in one federal prison, one inmate received inadequate medical treatment.  Accepted as true, that fact would not render the allegations of Kendig's involvement, either directly or through policy directives, plausible.  Since the Complaint lacks further allegations of Kendig's personal involvement, the *Bivens* claim against him must be dismissed.

### B. Defendant Cross

With respect to Cross, the former Warden at the MCC itself, the analysis is slightly more complex. In addition to unsupported allegations based only on Cross' supervisory role, plaintiff has alleged that she and other inmates complained to Cross about the showers. (Cl. ¶ 21 ("Plaintiff and other inmates made numerous complaints to the prison staff and Defendant CROSS regarding the problems with the C tier shower").) Similarly plaintiff alleges that following the shower incident she wrote a written complaint to Cross regarding her medical treatment. (Cl. ¶ 50 ("plaintiff…made…a written complaint to the Warden").) However "the receipt of letters or grievances, by itself, does not amount to personal involvement." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (granting motion to dismiss and explaining that "[t]he reason for this is simple: DOCS commissioners and prison superintendents receive large numbers of letters from inmates, and they delegate subordinates to handle them. If courts found personal involvement every time a supervisor forwarded a complaint to a subordinate, the requirement would lose all meaning.") (*citing Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (DOCS Commissioner had no personal involvement when plaintiff wrote him two letters, one an appeal the Commissioner had referred to the prison superintendent for decision); *Higgins v. Artuz*, No. 94-4810, 1997 WL 466505, at *7 (S.D.N.Y. Aug. 14, 1997) (Sotomayor, D.J.) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations" (quotation marks and citation omitted)); *Watson v. McGinnis*, 964 F.Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.")). Since the only non-conclusory allegations of

9

Cross' personal involvement are limited to his receipt of complaints, the *Bivens* claims against him must be dismissed.

### C. Defendant Glover

The Complaint is slightly more fact specific with respect to Glover, the Clinical Director for the MCC. As support for the allegation that Glover "subjected the Plaintiff to unreasonable and inhumane medical care under which the Plaintiff was injured," (Cl. ¶ 14.) the Complaint alleges a modicum of personal involvement. "On January 29, 2009, Defendant Glover refused to see the Plaintiff." (Cl. ¶ 52.)

Defendants contend that "this allegation is not actionable" because "prison officials took Manswell to be examined and treated by an outside eye specialist that same day." (Def. Opp. 2, n. 2.) However both cases cited by defendant in support of this proposition were at the summary judgment stage, deciding on the basis of an established evidentiary record whether a constitutional violation had actually been demonstrated. *See Odom v. Keane*, No. 95-9941, 1997 WL 576088 (S.D.N.Y. Sept. 17, 1997) (summary judgment); *Guillen v. Bartee*, No. 07-236, 2008 WL 706536 (W.D. Va. Mar. 14, 2008) (same). Neither dealt with the very different question of whether a doctor's refusal to treat an inmate in his care renders plausible the allegation that he was personally involved in her allegedly inadequate care. The Court finds that it does, and therefore Glover's personal involvement has been plausibly plead.

It is a separate question whether Glover's involvement, as alleged, satisfies the requirements for a Constitutional violation. An "Eighth Amendment violation based on deliberate indifference to a prisoner's medical needs contains both an objective an a subjective prong." *Hemmings v. Gorczyk*, 134 F.3d 104, 108-09 (2d Cir. 1998). The objective prong requires that the alleged deprivation "be sufficiently serious, in the sense that a condition of

10

urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway*, 99 F.3d 550, 553 (1996). The subjective prong requires that the charged official act with the requisite state of mind—that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Taken as true for purposes of a motion to dismiss, the Complaint alleges that plaintiff's injuries caused her severe pain and hardship. The Court need not guess at the sensation of having a rust-filled eye developing an infection, but suffice it to say that the Complaint's allegations satisfy the objective prong.[2] As for the subjective prong, the allegation that Glover refused to treat plaintiff plausibly suggests that he was personally involved in deliberate indifference to her medical needs.

In arguing that plaintiff has not alleged a constitutional violation, defendants again confuse the standards applicable to a motion to dismiss with those applicable to post-discovery motions. All but two of the cases cited by defendant on this issue were decided on appeal from summary judgment or post-trial motions. (*See* Def. Mem. 9-13 (citing *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (summary judgment); *Hudson v. McMillian*, 503 U.S. 1, 9 (same); *Doyle v. Coombe*, 976 F. Supp. 183 (W.D.N.Y. 1997) (same); *Farmer v. Brennan*, 511 U.S. 825 (1994) (same); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (same); *Hendricks v. Coughlin*, 942 F. 2d 109, 113 (2d Cir. 1991) (post-trial motions)). And in both of the two cases

---

[2] Defendants' argument that plaintiff has not sufficiently alleged "that her eye condition worsened because Dr. Glover sent her to an eye specialist, rather than treat her himself," (Def. Mem. 13), is unavailing. To the extent that is a requirement applicable on a motion to dismiss, defendants' argument suffers from two defects. First, the Complaint does not state that Glover sent plaintiff to the specialist rather than treat her, but only that he "refused to see" her—defendants' assertion that it was a choice between treatment options, even if submitted as evidence rather than asserted in a memorandum, would be an inappropriate consideration on a motion to dismiss. Second, the Complaint does allege that the delay in adequate treatment aggravated plaintiff's injury: she was prescribed antibiotics for an infection that developed in plaintiff's left eye in the days between the injury and her visit to the specialist. (*See* Cl. ¶ 55.)

11

cited by defendants that do involve a motion to dismiss, the Second Circuit *reversed* the lower court and found that the deliberate indifference claims *did* warrant discovery. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (reversing district court's 12(b)(6) dismissal because "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case"); *Hemmings v. Gorczyk*, 134 F.3d 104, 108-09 (2d Cir. 1998) (reversing district court's 28 U.S.C. § 1915 dismissal of claims based on deliberate indifference to serious medical need). In fact, defendants urge the Court to adopt the very same reasoning that the Second Circuit found to be error in *Hemmings*.

> The district court believed that dismissal of the suit … was warranted because Hemmings received treatment for his injuries, and the fact that he disagreed with the treatment he was provided or that prison officials negligently diagnosed his condition does not suggest "deliberate indifference." While we agree that the fact that Hemmings received some medical attention … substantially weakens his claim of deliberate indifference, we are not prepared to say that his claim is so completely devoid of merit as to justify dismissal at this early stage. Hemmings has alleged facts that could potentially show, upon further development, that his condition was sufficiently painful to satisfy the objective prong of the deliberate indifference test under the Eighth Amendment. He has also advanced a colorable claim that the defendants wilfully disregarded his condition…

*Hemmings*, 134 F.3d at 108-109. Even under *Twombly* the question at this juncture is not whether plaintiff has proven a constitutional violation, but rather whether the facts alleged render plaintiff's allegation of one plausible. Since the Complaint plausibly pleads both the subjective and objective elements of a deliberate indifference claim against Glover, plaintiff is entitled to discovery.

### III. Conclusion

Defendants' motion to dismiss the *Bivens* defendants, [16], is granted in part. Counts one through four, as alleged against defendants Lappin, Dodrill, Cross, and Kendig, are dismissed without prejudice and with leave to replead. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

SO ORDERED.

Dated: New York, New York
       August 9, 2010

Richard J. Holwell
United States District Judge